IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JIM DAWS TRUCKING, LLC, | ) | CASE NO. 4:24-CV-3177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **BRIEF IN SUPPORT OF** |
| | ) | **STATEMENT OF** |
| DAWS, INC.; JAMES R. DAWS; LANA R. DAWS; DAWS TRUCKING, INC.; and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, | ) | **OBJECTIONS TO** |
| | ) | **MAGISTRATE JUDGE'S** |
| | ) | **ORDER** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

The sanctity of the attorney-client privilege is one of the foundations of our legal system. Clients have to be able to trust that their private communications with their lawyers will remain confidential. If clients fear that their private communications with their lawyers will be made public, and potentially used against them, they will have the incentive not to be fully transparent with their attorneys. This undermines the legal system.

For many years, Jim Daws ("Jim") communicated with his attorney Julie Karavas at Karavas & Kranz P.C. ("Karavas") regarding matters relating to his personal estate plan, and his various companies, and personal business advice, using his jim@daws-trucking.com e-mail address. Jim, who was sixty-eight years old at the time of the APA, is not tech savvy and did not understand that, because of the e-mail address he used, his e-mail communications with his lawyer dating back

for years were saved on a server owned by Daws, Inc. He reasonably assumed that his confidential communications with his lawyers belonged to him personally and would remain confidential.

In May 2022, Jim Daws Trucking, LLC ("JDT") purchased the assets of Daws, Inc. including the Daws, Inc. computer server. JDT takes the position that Jim waived the attorney-client privilege by selling the Daws, Inc. server to JDT. When JDT first raised this waiver argument, Jim filed a motion for protective order.

In an order dated September 23, 2025 (the "Order"), Magistrate Judge Nelson erroneously denied the motion holding that Jim waived the attorney-client privilege by (1) Daws, Inc. selling the server, and (2) sending attorney-client e-mails from jim@daws-trucking.com when the Daws, Inc. handbook allowed for e-mail monitoring. The Magistrate Judge also erred in holding that two e-mails mistakenly sent by Karavas to Jim's jim@daw-trucking.com e-mail account waived Jim's attorney-client privilege. To protect the sanctity of the attorney-client privilege, the Order should be reversed and vacated and the requested protective order should be granted.

## LEGAL STANDARD

"A district court may reconsider a magistrate judge's ruling on nondispositive pretrial matters where it has been shown that the ruling is clearly erroneous or contrary to law." *Ferguson v. United States*, 484 F.3d 1068, 1076 (8th Cir. 2007) (citing 28 U.S.C. § 636(b)(1)(A)). "A finding is clearly erroneous when 'although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Lisdahl v. Mayo Foundation*, 633 F.3d 712, 717 (8th Cir. 2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

## BACKGROUND

Jim is the founder and President of Daws, Inc. (Filing 35-1 ¶ 3). Over the course of Jim's career, he also formed or acquired ownership interests in other companies, including Daws Trucking, Inc., Columbus Transportation & Logistics, LLC ("CTL"), and J&L Enterprises, LLC. *Id.* ¶ 4. Jim did not have separate e-mail addresses for each of his companies; he used his "jim@daws-trucking.com" e-mail address to conduct business for all of his companies. *Id.* ¶ 5. As the founder and owner of such businesses, Jim also used that e-mail address for personal communications; he did not have a different, non-business e-mail address. *Id.* ¶ 11.

To house the data of all of Jim's separate companies, Daws, Inc. purchased a server. Unbeknownst to Jim, who is not tech savvy, his e-mails, including his e-mails with his attorneys, were stored on this server. *Id.* ¶ 10.

Jim has maintained a long-standing attorney-client relationship with Karavas. *Id.* ¶ 7. Over the years, Jim has retained Karavas as both his personal and corporate business attorneys. *Id.*

In early 2022, Rick Fernandez ("Rick") approached Jim about purchasing the assets of Daws, Inc. Jim sought legal advice from Karavas regarding that transaction, which resulted in the sales of the assets of Daws, Inc. to JDT, on or

3

about May 4, 2022. *Id.* ¶ 8 (Filing 1-1). JDT did not purchase the shares, or liabilities, of Daws, Inc. in the APA. Filing 35-1 ¶ 9. Daws, Inc. remains a separate company owned by Jim and his wife. Filing 35-1.

As part of the APA, Daws, Inc. sold its server to JDT. Being unsophisticated in technology, Jim did not intend to sell the data on the server that belonged to his other companies, nor his personal communications with his lawyer. *Id.* ¶ 10.

Before and after the APA, Jim used his "jim@daws-trucking.com" e-mail address for personal and business purposes. *Id.* ¶ 11. Daws, Inc. had an employee handbook that expressly permitted employees to use company e-mail for limited personal use. The Daws, Inc. Handbook stated:

> The Company provides E-mail and computer equipment for use in conducting Company business. Such equipment and services should be used primarily for business purposes. They are to be used for personal reasons only during nonworking time.
> …
>
> Electronic Mail – Electronic Mail (E-mail) is to be used primarily for business purposes and only for personal reasons during nonworking time. Like your computer, the Company may need to access your E-mail for various reasons. You should be aware that such messages are not entirely confidential. They can be forwarded to others without the original sender's knowledge. E-mail can be viewed by others who may improperly use a password to breach the security of the system. In addition, disclosure of E-mail messages may be required in lawsuits against the Company. As a rule of thumb, nothing should be sent by E-mail that you would not put in a formal memo or that you would not like to become public knowledge. Do not use derogatory, offensive or insulting language in any E-mail message.

(Filing 35-3 p. 20). The Handbook goes on to state that the "President of the Company" would enforce such policies "at its sole discretion." *Id.* at p. 23. At all times, Jim was the President of Daws, Inc.—and, therefore, enforcer of the e-mail

4

policy. As such, he reasonably had a complete expectation of privacy *in his own e-mails*. Filing 35-1 ¶¶ 11, 16, 17, 18, 19, 21, 22. He did not interpret the policy to apply to his e-mails as the President of Daws, Inc. *Id*. ¶ 28. He never monitored his employees' e-mails. *Id*. ¶ 12.

Furthermore, no one else had authority to monitor Jim's e-mail use under the Daws, Inc. policy. *Id*. ¶ 12. In practice, Daws, Inc. did *not* examine employees' personal e-mails sent from their "@daws-trucking.com" e-mail addresses, and employees were in fact permitted to use their "@daws-trucking.com" for personal use. *Id*. ¶ 12. No one monitored Jim's e-mail. *Id*. ¶ 12. Jim respected his employees' personal privacy and never claimed that if his employees communicated with their attorneys using their company e-mail address that they waived their attorney-client privilege with their lawyers. *Id*. ¶ 28.

After the APA, Jim became an employee of JDT, continuing his role as chief executive officer. *Id*. ¶ 13. Rick represented to all Daws, Inc. employees who chose to become JDT employees after the APA, that nothing would change in how JDT operated. *Id*. After the APA, Jim was never presented with a JDT Handbook, JDT employment agreement, nor a JDT e-mail use policy. *Id*. ¶ 14. After the APA, Jim continued to use his "jim@daws-trucking" e-mail to communicate with his attorneys about personal and business matters, as he had done in the past. *Id*. Jim reasonably believed his communications with his attorneys about personal matters, or matters related to his other companies, to be confidential and privileged. *Id*.

5

For example, before the APA, Jim routinely communicated with his attorneys throughout 2018 and 2019 about his personal estate plan using his "jim@daws-trucking" e-mail. *Id*. These communications took place three to four years before the APA. JDT had not yet purchased Daws, Inc. and such e-mails are clearly not relevant to this lawsuit—yet the Order authorizes JDT to view these e-mails under its broad waiver theory.

Additionally, JDT goes so far as to assert it can view e-mails in which it and Jim were adverse parties and separately represented by legal counsel. *Id*. ¶ 17. For example, in 2022 and 2024, Rick and Jim were negotiating the APA, and later a potential buy-back of JDT's assets. Jim engaged Karavas as legal counsel, and JDT was represented by its own counsel in such negotiations. Throughout such negotiations, Jim continued to communicate with his counsel at Karavas using his "jim@daws-trucking.com" e-mail address, again reasonably believing that such communications were privileged and confidential.

When the relationship between Rick and Jim soured after failed negotiations, JDT removed the server. Despite never providing Jim an employee handbook from JDT, notifying Jim that JDT could monitor his e-mails, and never having actually monitored anyone's emails in the two years since the APA, on September 30, 2024, Jim's last day of employment at JDT, JDT's attorneys, for the first time, claimed that Jim had waived privilege over all communications he had with his attorneys and that JDT could read and use Jim's e-mails with his attorneys as it wished. (Filing 35-2). Jim's counsel timely objected to JDT's contention. *Id*.

6

Counsel agreed on a protocol whereby JDT's vendor would provide copies of communications between Jim and lawyers so Jim's lawyers could review them and prepare a privilege log. JDT's vendor provided a total of 667 electronic files. Defendants' counsel reviewed those files, agreed that 239 of them were not privileged, and on November 14, 2024, provided Plaintiff's counsel with an initial privilege log regarding the remaining 428 documents.

## THE ORDER

Per the agreed upon protocol, on November 22, 2024, Jim filed a motion for a protective order regarding 428 documents it claimed were privileged. (Filing 34). On September 23, 2025, the Magistrate Judge denied Jim's motion. (Filing 147). The Magistrate Judge made three key holdings in the Order which are clearly erroneous or contrary to law:

1. "The Court finds that while the attorney-client privilege may have previously existed, Jim waived such privilege as to pre-sale communications when he sold the server on which those communications were contained." (Filing 147 at ECF p. 9).

2. "In sum, the Court finds that Jim did not have a reasonable expectation of privacy in his post-sale e-mail communications, thus waiving protections of the attorney-client privilege." (Filing 147 at ECF p. 13).

3. With respect to the two post-litigation e-mails "[T]he Court finds the inadvertent disclosure operated as a waiver of the privilege in these October 2024 e-mails." (Filing 147 at ECF p. 14).

## ARGUMENT

This Court has recognized that "[T]he attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system." *Benson v. City of Lincoln*, 343

7

F.R.D. 595, 607 (D.Neb., 2023) (Buescher, J.) (quoting *United States v. Ivers*, 967 F.3d 709, 716 (8th Cir. 2020) (internal citation omitted). The Order undermines this "sacred" privilege by setting an extremely low bar for the waiver of that privilege.

I. **THE SALE OF THE SERVER IS NOT A VOLUNTARY WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE WHERE JIM DID NOT KNOW HIS COMMUNICATIONS WITH HIS ATTORNEY WERE STORED ON THE SERVER.**

The Magistrate Judge's conclusion that the sale of the server constituted a waiver of the attorney-client privilege, despite the undisputed evidence that Jim did not know that his private communications with his attorney were stored on the server, is clearly erroneous and contrary to law.

"In diversity actions, state law determines the existence and scope of attorney-client privilege." *Gray v. Bicknell*, 86 F.3d 1472, 1482 (8th Cir. 1996); *see* Fed. R. Evid. 501. Nebraska law provides that "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. Neb. Rev. Stat. § 27-503(2). Nebraska law explains the showing necessary to waive a privilege. "A person upon whom these rules confer a privilege against disclosure of a confidential matter or communication **waives the privilege if** he or his predecessor, while holder of the privilege, **voluntarily discloses or consents to disclosure of any significant part of the matter or communication**. This rule does not apply if the disclosure is itself a privileged communication." Neb. Rev. Stat. § 27-511 (emphasis added).

8

> Waiver has been defined as a **voluntary and intentional relinquishment or abandonment** of a known existing legal right, advantage, benefit, claim, **or privilege**, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, **with the intent that such right shall be surrendered** and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right; or the intentional doing of an act inconsistent with claiming it.

*Five Points Bank v. Scoular-Bishop Grain Co.,* 350 N.W.2d 549, 552, 217 Neb. 677, 681 (1984). (emphasis added).

Jim could not have voluntarily and intentionally waived the attorney-client privilege by Daws, Inc. selling the server because the undisputed evidence is he didn't understand that his attorney-client privileged communications were stored on Daws, Inc.'s server. "Fairness is an important and fundamental consideration in assessing the issue of whether there has been a waiver of the lawyer-client privilege." *League v. Vanice,* 374 N.W.2d 849, 856, 221 Neb. 34, 44 (Neb. 1985). The amount of data available in a modern society is staggering. It is simply unfair to hold that a technologically unsophisticated party, like Jim, waives the attorney-client privilege when a company sells computer equipment that the seller did not know contained attorney-client privileged communications. The Order transforms the sanctity of the attorney-client privilege into a game of gotcha for the unaware. That is not the proper respect owed for such a foundational privilege. Because there is no evidence that Jim voluntarily and intentionally relinquished or abandoned the attorney-client privilege that attached to his communications with Karavas, the Magistrate Judge clearly erred in holding that Jim waived the privilege.

9

Recognizing that a waiver of the attorney-client privilege must be knowingly and voluntarily made before finding an implied waiver, Nebraska courts require that a party take an affirmative act to put attorney-client privileged communications at issue in a lawsuit. *See, e.g.,* State v. Roeder, 636 N.W.2d 870, 876–77, 262 Neb. 951, 958 (Neb. 2001) ("in the present case, Roeder impliedly waived the lawyer-client privilege as to relevant communications when she affirmatively made such communications a crucial issue to the resolution of her motion."); *League,* 374 N.W.2d at 856, 221 Neb. at 45 ("League is not permitted to thrust his lack of knowledge into the litigation as a foundation or condition necessary to sustain his claim against Vanice while simultaneously retaining the lawyer-client privilege to frustrate proof of knowledge negating the very foundation or condition necessary to prevail on the claim asserted against Vanice."). Jim did not take any affirmative act to put his communications with his lawyer at issue in this lawsuit. Therefore, the Magistrate Judge erred in holding that Jim impliedly waived the privilege.

When entering into the APA in May of 2022, clearly Jim didn't believe Daws, Inc. was selling his confidential e-mails with his lawyer from 2018 and 2019 regarding his personal estate planning, or any other matter. There is no evidence JDT believed that by purchasing the Daws, Inc.'s server it was intending to purchase Jim's confidential e-mails with his attorney regarding his personal estate plan, or any other communications with his lawyer. JDT's position is nothing more than a post-litigation rationalization to attempt to gain access to Jim's attorney-

10

client privileged communications to try to gain an advantage in litigation. There is nothing fair about that.

This case involves the sale of a small, family-owned business. It is not reasonable or fair to require Jim to search through Daws, Inc.'s entire server for e-mails that he didn't even know existed on the server, in order to preserve the attorney-client privilege. To the extent Jim's communications with Karavas related to the operation of JDT's business after the APA, the client in that situation is JDT and Jim has already agreed that those communications belong to JDT and are not privileged. But JDT and the Court's Order goes farther. The Order holds that any attorney-client communication stored in the deep recesses of the server is not privileged.

Based on Nebraska law that requires a party to knowingly and voluntarily waive the attorney-client privilege, the Magistrate Judge erred as a matter of law, and was clearly erroneous, in holding that Jim waived the attorney-client privilege when Daws, Inc. sold its server to JDT.

II.  **JIM DID NOT WAIVE THE ATTORNEY CLIENT PRIVILEGE OVER POST-SALE COMMUNICATIONS WITH HIS LAWYER BECAUSE HE HAD A REASONABLE EXPECTATION THAT THOSE COMMUNICATIONS WOULD REMAIN CONFIDENTIAL.**

The undisputed evidence established that after the APA (1) Jim became an employee of JDT; (2) JDT did not have an e-mail use policy; (3) JDT did not notify its employees it could monitor e-mails; and (4) JDT never actually monitored employee e-mail. Thus, Jim had a reasonable expectation that his personal e-mails with his attorneys would remain confidential. The Magistrate Judge erred in

11

holding that the e-mail policy contained in the Daws, Inc. handbook applied to JDT's employees after the APA, and that because of it Jim had no reasonable expectation that his communications with his lawyer would be private so he impliedly waived the attorney-client privilege.

1. **JDT had no e-mail use policy.**

JDT failed to show that it had any e-mail policy. JDT acknowledged that it never provided Jim with a JDT employee handbook after Jim became a JDT employee. (Filing 41-1 at ECF p. 3, ¶ 12). That's because there never was a JDT handbook. Rather, JDT claimed, and the Magistrate Judge agreed, that the Daws, Inc. handbook applied. But JDT did not produce any evidence that JDT ever ratified or approved the Daws, Inc. handbook's application to JDT employees. There is absolutely no support in the law that the handbook applicable to employees of one company apply to employees of another company.

After the APA, all Daws, Inc. employees became employees of JDT. It is undisputed that JDT did not have its own employee handbook. JDT failed to produce any evidence that JDT ever notified Jim that the Daws, Inc. handbook would apply to Jim as an employee of JDT. JDT failed to produce any JDT handbook or e-mail use policy that purports to apply to JDT employees. The fact that JDT cannot point to its own e-mail use policy supports the conclusion that Jim had a reasonable expectation that his use of his "Jim@daws-trucking.com" e-mail address to communicate with his lawyers after the APA would remain private.

12

The Magistrate Judge held that one of the assets JDT purchased in the APA was the Daws, Inc. handbook. (Filing 147 at ECF p. 10). "Therefore, **regardless of Jim's understanding** as to whether he was bound by the handbook policies, the Court finds the handbook policies continued to apply to Jim as an employee, which supports a finding of waiver of privilege in his e-mails." (Filing 147 at ECF p. 11) (emphasis added). The Magistrate Judge erred in holding that Jim's understanding of the applicable policies was irrelevant. Jim's understanding is crucial to the issue of waiver because if he did not understand that the Daws, Inc. handbook applied to him as an employee of JDT, then he had a reasonable expectation that his communications with his attorneys would remain confidential.

The Magistrate Judge found that "After the sale, Jim became an employee of JDT and understood "that nothing would change from how the company was run before the APA." (Filing 147 at ECF p. 10). The undisputed evidence established that how the company was run before the APA is that the company e-mail account was routinely used for personal reasons and were never monitored. This is especially true for Jim who was the President of Daws, Inc. and remained President of JDT after the sale. The fact that nothing was "to change from how the company was run before the APA" established that Jim had a reasonable expectation that his e-mail communications with his attorneys would remain private, just as they had before the APA.

To the extent the Daws, Inc. handbook applies to JDT's employees and Jim, the e-mail policy in the handbook is very lenient and does not constitute a knowing

13

and voluntary waiver of the attorney-client privilege. The handbook specifically states that employees may use company e-mail for personal purposes. (Filing 35-3 at ECF p. 21). While the handbook states that "You should be aware that such messages are not entirely confidential" *Id*., that statement is made in the following context: "They [e-mails] can be forwarded to others without the original sender's knowledge. E-mail can be viewed by others who may improperly use a password to breach the security of the system." *Id*. The policy addresses the actions of outside actors—third parties who forward an e-mail or who hack into the system through an improper use of a password. Nothing in the Daws, Inc. electronic mail policy says anything about Daws, Inc. or JDT monitoring or reviewing employee e-mails.

Moreover, the handbook granted Jim, as President of Daws, Inc., a position he continued to hold after the APA, with sole discretion to interpret the policy. (Filing 35-3 at ECF p. 23). Jim never monitored employee e-mails and he never interpreted the policy to apply to him, which is further evidence confirming his reasonable expectation of privacy in his own e-mail communications with his attorneys. The Magistrate Judge erred in finding that that Jim had no reasonable expectation his e-mails with his lawyer would remain private under the inapplicable Daws, Inc. handbook.

**2. Neither Daws, Inc. nor JDT monitored the use of employee's e-mail.**

JDT also failed to cite any evidence that Daws, Inc. or JDT ever monitored employee's personal e-mails. The fact that there is no evidence that Daws, Inc. or JDT actually monitored or reviewed any employee's e-mails, especially Jim's, is

14

further evidence that Jim had an objectively reasonable belief that his e-mail communications with his lawyers were confidential.

### 3. JDT did not notify Jim, and Jim was not aware of, any e-mail monitoring policies.

As discussed above, neither Daws, Inc. nor JDT had an e-mail monitoring policy. The Daws, Inc. handbook simply does not state that JDT can monitor employee e-mail. JDT did not dispute that in Jim's decades of work for Daws, Inc. and his more than two years as a JDT employee, that Jim was never informed of an e-mail monitoring policy, and Jim has testified that he is unaware of any such policy. (Filing 35-1 at ECF p. 3, ¶ 14). This evidence was unrefuted.

Because Jim had an objectively reasonable expectation that his e-mails with his attorneys using his "Jim@daws-trucking.com" e-mail address were private, Jim established that the e-mails in question are privileged. The Magistrate Judge erred in holding otherwise.

On September 30, 2024, JDT first claimed that Jim waived any privilege. The next day Jim's lawyer promptly notified JDT's lawyer that the documents were privileged. (Filing 35-2 at ECF p. 2). The privileged nature of Jim's communications with his lawyers simply wasn't an issue until JDT locked everyone out of the server, and then tried to take advantage of the situation to try to gain an advantage in this litigation.

In sum, JDT had no e-mail policy. To the extent the Daws, Inc. policy applied, it was very lenient and did not remove Jim's reasonable expectation that his communications with his lawyers using his "jim@daws-trucking.com" e-mail account

15

would be private. When JDT first raised the issue of waiver on September 30, 2024, the next day Jim's lawyer notified JDT that the e-mails remained privileged. Under Nebraska's fairness standard for determining whether a waiver of the attorney-client privilege has occurred, *see* Vanice, 374 N.W.2d at 856, and standard that a knowing and voluntary waiver must occur, see Neb. Rev. Stat. § 27-511; *Five Points Bank,* 350 N.W.2d at 552. Jim did not voluntarily waived the attorney-client privilege regarding the e-mails at issue. The Magistrate Judge erred in holding that Jim did not have a reasonable expectation in the privacy of his e-mail communications with his lawyer and, therefore, waived the privilege.

### III. KARAVAS MISTAKENLY SENDINGING E-MAILS TO JIM'S DAWS-TRUCKING E-MAIL ADDRESS DID NOT WAIVE JIM'S ATTORNEY-CLIENT PRIVILEGE.

In Nebraska, the attorney-client privilege belongs to the client, not the attorney. *See* Neb. Rev. Stat. § 27-503(2). Thus, an attorney cannot waive the attorney-client privilege without the client's informed consent. Neb. R. Prof. Conduct § 3-501.6(a). A lawyer has an ethical duty to notify a party that a communication was inadvertently received. *See* Neb. R. Prof. Conduct § 3-504.4(b) ("A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.").

Jim's last day of employment with JDT was on September 30, 2024. On October 1, 2024 and October 9, 2024, Karavas mistakenly e-mailed Jim at his jim@daws-trucking e-mail address rather than his personal Gmail address. On

16

October 2, 2024, JDT sued Jim. (Filing 1). Karavas' inadvertent use of Jim's old e-mail address is understandable considering Jim had communicated with her for years using that e-mail address and the common auto-populating feature of e-mail. An innocent mistake by a lawyer shouldn't waive the client's privilege, which requires a knowing, intelligent, and voluntary waiver. Again, under Nebraska law fairness dictates whether the privilege is waived. *See League*, supra. It is completely unfair for Karavas' innocent mistake to waive Jim's privilege.

Moreover, Karavas' October 9, 2024 e-mail contained the following disclaimer:

> This transmission (and/or the documents attached) may contain confidential information belonging to the sender, which is protected by the attorney-client privilege and the Electronic Communication Privacy Act, U.S.C. Section 2510-2521. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, or distribution, or the taking of any action in reliance on the contents of this information, is strictly prohibited. While precautions are taken against computer viruses, it is your responsibility to scan for their presence and we accept no liability or responsibility therefore. If you have received this transmission in error, please notify us immediately by telephone at 308-946-3071.

Privilege Log, Object ID 10130 (available for in camera review). Instead of JDT notifying Karavas informing her that she sent the e-mail to the wrong address, JDT wants to use the e-mail. When current counsel learned of these mistakenly sent e-mails, Jim included them in his privilege log and filed a motion for a protective order which are reasonable steps to rectify this inadvertent error. The Magistrate Judge erred in holding that the privilege over these two e-mails was waived by an inadvertent disclosure by counsel.

## CONCLUSION

Under Nebraska law, the attorney-client privilege is only waived where the client makes a knowing and voluntary waiver. The undisputed evidence showed that Jim always intended that his communications with his lawyer would remain confidential and he never intended to waive that privilege. The reasonableness of his expectation that his communications would remain confidential is confirmed by the fact there was no policy that the e-mails of the President of the Daws, Inc. and later JDT, could be monitored and in fact they were never monitored. Jim's companies were small operations and he was in charge. Jim reasonably believed that no one would monitor his e-mail communications with his lawyer because it had never happened—ever. Indeed, JDT didn't have an e-mail policy at all, but instead is trying to glom on to Daws, Inc.'s employee handbook which JDT never adopted for its employees. Nebraska law recognizes that fairness is an important consideration in weighing whether the privilege is waived. There is nothing fair about JDT's attempt to take advantage of the fact that Jim's e-mails with his lawyers were unknowingly to Jim stored on the server JDT purchased. Because that attorney-client privilege is foundational to our legal system, any doubt regarding waiver should be resolved in favor of upholding the privilege.

The Order sets too low of a bar for the waiver of the attorney-client privilege. For the reasons discussed above, fairness dictates that the Order should be reversed and vacated, Jim's motion for protective order should be granted, and JDT should

be ordered to destroy the privileged material in its possession and be prohibited from using it in this case.

DATED this 7th day of October, 2025.

> DAWS, INC., JAMES R. DAWS, LANA R. DAWS, DAWS TRUCKING, INC. and COLUMBUS TRANSPORTATION & LOGISTICS, LLC, Defendants
>
> BY:  /s/ Timothy J. Thalken
> Timothy J. Thalken, #22173
> Meghan M. Bothe, #25208
> FRASER STRYKER PC LLO
> 500 Energy Plaza
> 409 South 17th Street
> Omaha, NE  68102-2663
> (402) 341-6000
> tthalken@fraserstryker.com
> mbothe@fraserstryker.com
> ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d), counsel certifies that this brief contains 4,990 words including all text, captions, headings, footnotes, and quotations according to the word count function of Microsoft Word 365. No generative artificial intelligence program was used in drafting the document, or that to the extent such a program was used, a human signatory of the document verified the accuracy of all generated text, including all citations and legal authority.

/s/ Timothy J. Thalken

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of October, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Timothy J. Thalken

3463889.03